First, please call the next case. 109-3196 Barrington Orthopedic Specialists v. Sandor Good morning. Please support counsel. My name is Michelle Lafayette on behalf of the Appalachian Barrington Orthopedic Specialists. We're here today because the commission found a fusion surgery was causally related to a November 17, 2006, work accident. And I'd like to phrase the question as whether the November 17, 2006, incident while the employee was at work accelerated the need for the pre-existing condition. We recognize that when there is a pre-existing condition present, the claimant must show that a work-related injury aggravated or accelerated the pre-existing condition such that the employee's current condition of well-being can be seen to be connected to the work-related injury and not simply the result of the normal degenerative process. We recognize that. But in this case, the fusion surgery was medically necessary before the accident. It was medically necessary before she came to work for us. There's no way in which the commission could reasonably find to support their decision that this incident on November 17, 2006, either aggravated or accelerated the condition to the point that the fusion was now needed. It was already medically necessary. What did Dr. Butler say? Dr. Butler stated that she would have been a surgical candidate regardless of the November 17, 2006, incident. But because she was subjectively reporting some increased pain symptoms, he felt this incident aggravated the underlying pre-existing condition. But I think you need to look at this as almost doing, when I developed this case, I put two columns, before November 16th, after November 16th. And I looked at all of the objective medical evidence when I did this, including the subjective component, which is her complaints of pain. When she sees Dr. Conowentz, who has been reporting her complaints up to and including the time of the accident, she describes consistently her complaints as burning, stabbing, sharp, cramping and spasm-like. She has left leg discomfort, which she describes as a tingling and numbness. And she even before November 17th is saying that the symptoms are similar to what she had prior to the original microdiscectomy that she underwent in December of 2005. After November 17th, she sees Dr. Conowentz on November 20th. And how does she describe her symptoms? Burning, stabbing, sharp, cramping and spasm-like once again. They're the same. She says she still has the leg discomfort, which she subjectively says is increased in terms of the intensity of the numbness. But that's subjective. Look at the MRI findings prior to November 17th, 2006 and after November 17th, 2006. There's an MRI study for July 14th, 2006, because she's in the pain management program. The MRI study demonstrates degenerative changes at the L4 and the L5 S1 levels. So obviously it's your position, and you will delineate them very articulately, that there were no new symptoms after the incident. There's no new symptoms. And there's also no new objective findings on any of the imaging studies. Everything is the same. You're not arguing that the commission can only award, give an award based on objective findings, are you? No. No. What about the argument, I'm sure you would make, that after the incident, she reported what is phrased as new symptoms, leg weakness and a grinding pain after the incident. Is that not a new subjective complaint? I don't really think it's a new subjective complaint. I think it's a different way of explaining her complaints. Because she really consistently has the same complaints of pain. She consistently has the same objective findings. And most importantly, the treatment recommendation is the same. Dr. Butler's treatment recommendation to her on August 2nd, 2006 is you need a posterior fusion at L4-5. His treatment recommendation to her on August 2nd, it's the L4-5 level. Actually, I think the case falls in line with the prior decision of the Appellate Court in Hansel and Gretel Day Care Center. It's strikingly similar in the sense that in Hansel and Gretel Day Care Center, the employee had a longstanding issue of difficulties with her knee. It would repeatedly lock up on her over a period of about 10 years. On the day that she was working in what became the source of the underlying litigation in that case, she was sitting at a child's table when her knee locks up, and when she gets up, she then has pain in the knee. This Court vacates the Commission's finding that there's a causal connection between the underlying medial meniscus tear that's diagnosed only after this incident at work, not before. So, I mean, that's slightly different than the case we have here, because here we've got the disc herniation and the degeneration diagnosed before. We've got the treatment recommendations all prescribed before. But this Court vacates the finding of causal connection as being against the manifest weight of the evidence, because it was all part of the natural degenerative process. Let's set aside the subjective compliance, and it's subject to interpretation, and I think you're doing a good job of marshaling your arguments. What about Butler's opinion? Clearly, Butler opined that while she might have needed surgery without the work incident, he clearly said that it aggravated the condition, she developed a new neurological deficit after the work incident, it accelerated the need for surgery based upon the increased pain, inability to function, and neurological deficit. So why can't the Commission hang their hat on Butler's testimony? The problem with Dr. Butler's testimony, with the Commission relying on that, is he's contradicting himself as well, because he has recommended this posterior spinal fusion to her on August 2nd, 2006. True. Well before the accident. How can it suddenly now be related to a November 17th, 2006 incident when she just kind of twists her back, when she subjectively says my pain is worse, I can't control it anymore? She's saying it accelerated the need for surgery. It might have been a need for surgery, but the incident accelerated, exacerbated her condition, and accelerated the need for surgery. Why can't that be legitimate? I think it's contradictory, I think. Acceleration is contradictory? Well, I think saying that this incident accelerated the need for surgery is contradictory. It's contradictory because if surgery was already needed on August 2nd, 2006, and Dr. Butler's telling her at that time, the only way you're really going to get better, we can sit here and put the Band-Aid on it and send you to pain management with Dr. Conowitz and see how it goes, which is basically what Dr. Wehner testifies to. Dr. August 2nd, 2006 was not a convenient time for this claimant to have surgery. She didn't have health insurance and she was starting a new job the next day. It's not a good time to go in and have surgery. November 16th, 2006 looks like a more convenient time to now have surgery because she's got the employer. And keep in mind, too, she's been working as the workers' compensation intake coordinator for this employer. So you can kind of see the wheels in everybody's head turning here. This thing happens at work. Now I can find somebody who can pay for it. But that's not really how this works. It's line up what her symptoms were, what her condition was prior to and then after it. Well, that's what Dr. Butler was doing. And I understand your argument. So are you saying that if somebody has a condition and they may need surgery ultimately at some point down the road, something happens at work that ups the timetable, that accelerates the need for surgery as a matter of law, then they can't recover because they would have needed surgery anyway? Is that your position? I think it is to some extent our position. I mean, you can't say that, you know, somebody that's never been to a doctor, has never had any symptomology, has never had the condition diagnosed, and then suddenly there's a work injury and the condition's diagnosed and now they need surgery. They may have, the condition may have existed beforehand and nobody knew about it. Now to say that the work injury didn't change that and Dr. Butler says, I don't recommend surgery to patients who are not surgical candidates. He acknowledges that. So she's a surgical candidate for this condition. At some point. As of August. She's a candidate, though, when he sees her on August 2nd, 2006. But don't they also say that she was going in the opposite direction, she was managing it well. Clearly the incident, he connects it to the need for surgery in an accelerated basis. But she really wasn't managing her symptoms well. And she wasn't managing her symptoms well because she needed to see Dr. Conowitz on a monthly basis. She saw him in August, she saw him in September, she saw him in October. And when she sees him on November 20th, it's just the regularly scheduled appointment. It's the next one coming up for the following month. Her pain symptoms when she sees Dr. Conowitz at each one of these occasions are the same. Everything stays the status quo. Especially the commission believed the claimant in Dr. Butler, correct? Essentially, yes. But I believe they erred in doing so. And they erred in doing so because the underlying evidence upon which Dr. Butler is basing his opinion is that there's no change in her condition. Under this decision, if you have ever He never said that. He said there clearly was a change in her condition. No, but the underlying evidence, there's no change in her condition. There's no objective change in her condition. There may be a subjective change in her condition, but there's no objective change in her condition. And Dr. Butler is saying there's a change in her condition, but the objective medical evidence, which is these MRI studies, the diagnostic studies, the examination findings are all saying there's not a change in her underlying condition. Doctors rely on both objective and subjective findings in rendering opinions, correct? Correct. They do. And Dr. Butler looked at both her subjective complaints of pain and how those changed, as well as the objective findings, and rendered an opinion that it had, that the accident had accelerated. Yes, he did. That was his opinion. So why should we limit ourselves, or why should the commission be limited to looking only at the objective findings? Well, I think you can, there's also the opinion of Dr. Wehner in the record. So there we have two contrary doctor's opinions and the commission chose one, and so it's a manifest way to the evidence argument. Correct. It's a manifest way to the evidence argument. But I think you have to look beyond the doctor's opinions and what the doctors have based their opinions on, and what that objective medical evidence is to find that the commission's reliance on Dr. Butler. So basically what you're wanting us to do is look at the objective medical evidence and just decide that Dr. Butler's opinion was wrong. Well, I think look at the objective medical evidence, look at Dr. Wehner's opinions, and also look at how Dr. Conowitz documents the claimant's complaints when he sees her in October versus how he documents when he sees her in November of 2006. He's documenting the same complaints, Dr. Conowitz's, from October to November 20th of 2006. So there's really no change in the underlying condition. I mean, under this decision, we're paying, we're being ordered to pay for a fusion that she was already a candidate for and that was already medically necessary for her to undergo on August 2nd, 2006, because Dr. Butler would not have told her, and he acknowledges this, he would not have told her she needed surgery unless she truly needed surgery. You can try and put a Band-Aid on that condition, but to then allow for the fusion surgery after what is a relatively low-impact trip and fall at work, with actually no fall, she catches herself before she falls and sort of has a twist, really sort of, I mean, it just... You seem to be dancing around the issue, but are you sort of saying very candidly and bluntly that maybe the claimant, quote, unquote, in your opinion, sees that an opportunity to have somebody pay for the surgery? You seem to be saying that, you might as well come out and say it. Would I be lying if I said did the thought run through my mind? No. I mean, it definitely ran through my mind. It probably ran through the insurance adjuster's mind. I mean, when you look at the facts, we're human beings. It runs through your mind to think that. I do think her position with the employer as the workers' comp intake coordinator gave her the knowledge and insight into sort of how the system works a little bit within the doctor's office and gave her some knowledge, but do I think there's something overt that, you know, or fraudulent that's gone on here? No. I mean, I don't think... So there's nothing in the evidence that you could hang your head on that issue, right? Correct. There's no evidence to hang her head on with that issue, but I think it's sort of, when you look at it, I mean, even in the context of two of the other cases, Cispro and St. Elizabeth's Hospital, I mean, Cispro's different factually. I mean, in Cispro you have a gentleman who is diabetic and going to a podiatrist for preventative care, but he doesn't have any of the symptoms associated with Charcot's until after he twists his ankle while he's at work. And he has more complications than somebody without diabetes may experience when they twist their ankle at work. So when the court... But the facts are not necessarily important. Cispro stands for the proposition you've acknowledged, that the acceleration or aggravation of a need for surgery. We didn't make the surgery medically necessary. And, yes, it was sort of in the claimant's control, when am I going to have surgery, but it's still medically necessary. Let me ask you this very specific question. Do you have any case law authority you can call our attention to that says, under the way you phrase the issue, the fact that somebody already needed surgery, in the opinion of the treating doctor, would then put the patient in preclude recovery under the act? I did not find any cases that state that per se. But I think if you look at the Hansel and Gretel decision, I mean, that's a case in which it's slightly different factually, because the surgery wasn't recommended until after the accident at work. But there's a claimant whose condition of the knee was so severely degenerated that the court recognized that this was just part of the natural degenerative process and not accelerated by the work injury. It probably would have been easier in Hansel and Gretel to say that the work injury caused the need for surgery, because the recommendation didn't come until after the work accident, than it is in a case such as this one, in which the recommendation for surgery came three months before the work accident and the day before she started working for us. Possibly out of time, everybody. Possibly. May it please the court. Does greater Peoria help you? Your Honor, greater Peoria. I believe the cases that were cited clearly help our position. Again, the manifest weight of the evidence is the standard of review for this court as it was in the Circuit Court of Cook County on this particular case. The manifest weight of the evidence is you look at all of the evidence presented in the case, and if there are differing opinions or inferences, different inferences drawn from the facts presented in the case, then it is the commission's purview to decide the case based on those different facts. This court can only reverse the commission's determination if it is against the manifest weight of the evidence. Before I begin at least my formal argument, I would like to address what was brought up when Ms. Lafayette was in front of you earlier with respect to insurance, that there seems to be a suggestion that Kathleen Sanborn was using the system to some degree. Well, she worked as a workers' comp coordinator. Do you know what she was doing? That is correct. She worked less than four months when she came up with the injury? That is correct, from August 3rd to November 17th. But I will point out to you one very important aspect of this case. You'll note that the commission awarded $145,000 in medical expenses with no insurance. That is correct. No 8-J credit. The reason for that is the surgery and the treatment was paid for by Kathleen Sanborn's husband's group health insurance. Kathleen Sanborn's treatment prior to treating, prior to the injury, prior to working for Barrington Orthopedics was paid for by her husband's group health insurance carrier. But did she have to pay it? Did who? Did Kathleen have to pay it? No. Blue Cross Blue Shield, her husband's group insurance carrier, paid the medical bills both before she was employed by Barrington Orthopedics and after she was employed by Barrington Orthopedics. There is no argument that you can present or hang your hat on that said that she was delaying surgery because of financial reasons. She had insurance through her husband's group insurance carrier the entire time. When they denied further treatment, the workers' comp insurance carrier, after the IME with Dr. Wainer, what does she do? She doesn't delay surgery. We're not here in front of you saying she needs surgery, that prospective treatment was awarded by the arbitrator of the commission. She went and had the surgery. That surgery was paid for by her husband's group insurance. All right, but tell me why, if her husband's group insurance bills are paid for, why should she get the windfall? Because under the statute, HA credit is only allowed to the employer if they've paid portions of the group insurance premium. In this particular case, they don't. Now, you talk about windfalls, I'm not sure this is kind of going off on a tangent, there really isn't a windfall. We've already addressed that. We'll have a requirement under lien rights for Blue Cross Blue Shield and their policy that says we don't normally pay for occupational injuries once if this court upholds the decision of the commission, which I would expect them to do under the manifest weight standard. We would then have an obligation if it's not appealed, if that award is paid, we would then have an obligation to repay Blue Cross Blue Shield for the payments they made on this particular case. So there is no windfall, it's probably paying it from one to the other. We can probably move off that. I think there's sort of the invitation in the air to read between the lines and sort of conclude that maybe the claimant gamed the system, but, you know, there's no evidence really of that, and it does get us off on a tangent. What I'd like to ask you is, counsel has alluded or presented the argument that, look, there's no real medical evidence, objective medical evidence to support the conclusion of the claimant's claim. That the incident at work aggravated or accelerated her condition. So succinctly tell us what medical evidence supports the finding that the incident at work accelerated, exacerbated, or aggravated the condition. First of all, I clearly disagree with that statement that there is no medical evidence that shows changes prior to the injury when compared to Kathleen Sandworth's condition post-accident. We'll go through that. And even Dr. Butler pointed that out. There appears to be, and clearly there's a, there's significant medical records, voluminous medical records that talk about Kathleen Sanborn improving, moving away from surgery from the time she begins treating with Dr. Conowitz in early 2006 up to when she ultimately has her work accident in November of 2007. I'll point out to you, Dr. Conowitz's note of August 24th, his examination of Kathleen Sanborn, normal gait, normal muscle strength, normal straight leg test, epidural injection on September 26. She returns on October 26, 2006. He notes that she reports she was improving. Her resting pain score was 1 out of 1 to 10. She reports she was pain free 50% of the time. Her gait was normal. Full range of motion to her lumbar spine. A negative straight leg raise test. All he recommended was some medications, oral medications, and her testimony was, I was exercising three times a week. I was swimming. She goes on, that was the last visit before the accident on October 26. She testifies that she's very active. There's a, I raised the argument at the commission, there's an elephant in the room as well that Barrington Orthopedics fails to address. There seems to be a lot of elephants in the room in this case, counsel, for some reason. The elephant in the room is, how do they explain the fact that Kathleen Sanborn worked for them for three and a half months, worked 40-plus hours a week, required to sit in a chair for three and a half months. She sat at her desk 80 to 85% of the time. Didn't miss any time from work. Didn't complain other than to this Nancy Farrand who there's some credibility issues every once in a while that she had back pain. She testified she never took medication because it makes her drowsy. She took it at the end of the day. Did they parade in any witnesses from Barrington Orthopedics saying, yes, she went, she got up from her desk to walk or deliver items. She walked in a hunched manner. She complained of back pain. She missed days from work because of her back pain. There is no evidence of that. For three and a half months, she worked 40 or more hours a week, she worked eight hours a day, five days a week with no problems. Is this someone who is on the brink of having spinal fusion surgery that she could sit seven, eight hours a day, perform her job duties as an intake coordinator for the hospital? She was not on the brink of having spinal fusion surgery that she could sit seven, eight hours a day, perform her job duties as an intake coordinator for the hospital? There is ample evidence in the record and the commission relied on that ample evidence to show there was a significant difference between Kathy Sanborn's low back condition prior to her work accident when compared to her symptoms after the work accident. Dr. Butler is the doctor who is most familiar with Kathleen Sanborn and her condition. He saw her before the accident. He saw her after the accident. As you pointed out, Mr. Justice, he says in his records very clear there was a significant change in her symptoms post-accident. She never had a neurological problem before. He noted a neurological problem in his orthopedic evaluation. That was of concern. In his deposition, he said that was of a concern. There was weakness in the quadricep muscles. That was never noted before in his deposition. That was a concern. If that was continuing without the surgery, they may not have a recovery, a very good recovery. There was weakness. There were a lot of changes in the condition after the work accident. And Dr. Butler opined credibly and the commission relied upon Dr. Butler's opinion that this incident accelerated the need for the surgery. Now you take a look at Dr. Wehner's testimony. Despite the credibility issues with Dr. Wehner, which are clearly apparent based on the amount of IME she performs, 99% of our behalf of respondents, she never asked Kathleen Sanborn the simple questions. Tell me what you were feeling before. Tell me what you were feeling after. She didn't want those questions. She didn't want to hear the answers to that. She admitted that in her deposition. She did not review the October 26, 2006 chart note from Dr. Conowitz. Why? Simply because that was a great chart note for Kathleen Sanborn, showing normal gait, negative straight leg, 50% pain-free, her pain scale was a 1 or a 2 on a 10 scale, doing exercises, swimming. She didn't want to look at that, whether she didn't have it or whether she chose not to look at it. And then she renders her opinion saying, well, there's no difference. But she did have to admit on cross-examination that she can't really look into a crystal ball and say, definitely Kathleen Sanborn would have needed to have the surgery on February 2007, because that's when she had her fusion surgery. I couldn't say that, you know, that she would have needed it in three months, six months, one year, two years, three years. She even admitted that many of her patients, when they go through pain management, they improve, even though she's recommended that they were surgical candidates. So you're saying in a minute of her symptomatology changed, and clearly the incident at work accelerated the need for surgery. That is correct. That's absolutely correct. That's what the commission found. That is not a determination that is against the manifest way to the evidence. With respect to Hansel and Gretel, I believe in my brief we kind of pointed out that there is a difference between Hansel and Gretel and this particular case. It's the medical testimony. The medical testimony in Hansel and Gretel was equivocal. The one doctor says, well, we don't even know if there's a meniscal tear or if the meniscal tear preexisted. The only way we can tell that is with an arthrogram or let's go in there and scope the knee and see what's going on. So the medical testimony was equivocal on whether or not that incident aggravated or accelerated. There is no equivocal testimony in this particular case. Dr. Butler is clear. His opinions are directly on point that this work accident aggravated this condition and caused an acceleration of the need for surgery. Leading to the need for the surgical fusion in February. With respect to Ms. Lafayette and Barrington Orthopedics' position that, again, in their brief, there's a bright line test that should be applied in this particular case. Again, your point is well taken. CISBRO and all of those cases have to say, or they do clearly state, you only need to show that the work accident was aggravated. A causative factor, either in the acceleration or aggravation of the condition. A causative factor. They were right. You have to take your employee as you find them, the eggshell skull case that most jurisdictions follow. To take this a step further, are they saying, Barrington Orthopedics, well, we accept that, but only to a certain extent. You know, if there's really, really someone who's got a really, really degenerative condition, well, we're not going to take those people, but the people that have less of a degenerative condition, we'll accept those as an eggshell. Again, the workforce is getting older. Everybody, at some point in time, or many people at many points in time, may have a diagnosis of, you're going to need a knee replacement, or you're going to need a hip replacement, or you're going to need this, or you're going to need that. Again, is that going to mean that the Brightline test is going to preclude all of those older workers from recovery under workers' compensation because they suffer an accident and they've been putting off that surgery, even though they show an acceleration or an aggravation? No, we can't pay benefits on that person because there's a diagnosis one year, two years, five years earlier, you know what, you're going to need a total knee replacement. You know what, you're going to need a hip replacement at some point in time in your life. So the act was promulgated with that in mind, and clearly this Court does not have the authority to ultimately write a decision with that type of a Brightline test. That's up to the legislature to determine these causal connections or these particular portions of the act. Thank you, counsel. Thank you. Actually, the law already draws that distinction, and it does it through the cases such as Sisbro or Hansel and Gretel or the Greater Peoria Transit case. In Greater Peoria Transit, the claimant just reached over to pick up a piece of paper and her shoulder dislocates. And recovery is not allowed for her and her conditions are not causally related because she was that ticking time bomb. In this case, Kathleen Sanborn was that ticking time bomb. There was so much degeneration in her lumbar spine that irregardless of the work injury, she required that spinal fusion. And for Dr. Butler to say just five days after the spine, after this incident at work, because it's November 22, 2006, when he now says this is because she accelerated her condition, she requires surgery, is really stretching his opinion and is really stretching where he's going with this, because she had two other incidences in which she twisted her back and she had a spiking of her pain. They were both in June. One was when she was hit by the waves while swimming in the ocean, and the other one was when she stepped off the stoop and twisted her back. And in those instances, they gave her system time to calm down and for her to go back to where she was, it was like they considered a baseline condition, which still resulted in them recommending surgery on August 2, 2006. Dr. Butler doesn't do anything, any of that in this case. He immediately recommends the surgery once again, and he immediately concludes that this caused her condition to aggravate, to be accelerated for the need for surgery. The surgery was already needed on August 2, 2006. It just needed to be performed when it was financially convenient for Kathleen Sanborn and when it was feasible for her to have the surgery. The day after she starts a new job is not the time to be talking about having surgery. Several months down the line, probably was. We would ask that you find the Commission's decision to be against the manifest way of the evidence and reverse it.